IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JEFFREY PLUNKETT, § | | |
| individually and on behalf of all § | | |
| others similarly situated, § | | |
| § | | |
| Plaintiff, § | | |
| § | | |
| V. § | No. 3:23-cv-2684-L-BN | |
| § | | |
| FIRSTKEY HOMES LLC, § | | |
| § | | |
| Defendant. § | | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Jeffrey Plunkett and Ethel June Maranan, individually and on behalf of all others similarly situated, have filed an Emergency Motion for Protective Order and Other Relief. *See* Dkt. No. 41. Plaintiffs allege that Defendant FirstKey Homes, LLC "has directly contacted Plaintiff Ethel June Maranan, opt-in Plaintiff Nicole Torres and other putative collective action members about the substance of this lawsuit and attempted to settle their [FLSA] claims through unauthorized, coercive and misleading 'Agreements' and without approval of the Court or Plaintiffs' counsel." Dkt. No. 41-1 at 1.

FirstKey responded, *see* Dkt. No. 45, and Plaintiffs filed a reply, *see* Dkt. No. 49. And the Court heard oral argument on May 20, 2024. *See* Dkt. No. 51.

For the reasons explained below, the Court grants in part and denies in part Plaintiffs' Emergency Motion for Protective Order and Other Relief [Dkt. No. 41].

-1-

The undersigned has authority to enter a nondispositive order granting attorneys' fees or other nondispositive sanctions or denying a request for what might be considered a dispositive sanction. *See* 28 U.S.C. § 636(b); *Merritt v. Int'l Bhd. of Boilermakers*, 649 F.2d 1013, 1016-17 (5th Cir. Unit A 1981) (per curiam); *Siegel v. Compass Bank*, No. 3:18-cv-1023-X, 2021 WL 4498914, at *1 (N.D. Tex. Jan. 11, 2021); *Green Hills Dev. Co., LLC v. Credit Union Liquidity Servs., LLC*, No. 3:11-cv-1885-L-BN, Dkt. No. 373 at 2 (N.D. Tex. Dec. 1, 2016) (following *Brown v. Bridges*, No. 3:12-cv-4947-P, 2015 WL 410062, at *1-*4 (N.D. Tex. Jan. 30, 2015)).

## Background

"Plaintiffs filed this action pursuant to 29 U.S.C. § 216(b) seeking to represent a collective action of all persons employed by Defendant as leasing agents from December 2020 to present. Plaintiffs allege that they and the putative collective members were subject to an unlawful policy whereby they worked overtime hours without overtime pay at one and a half times their hourly rate for all hours worked in excess of 40 per workweek." Dkt. No. 38 at 1.

"Within the collective action, there are two proposed subgroups of leasing agents. The first subgroup includes Plaintiff Jeffrey Plunkett and all other similarly situated leasing agents who were classified by Defendant as non-exempt employees under the Fair Labor Standards Act ('FLSA') but who Plaintiffs allege were denied overtime compensation at a rate of one- and one-half times their regular rates of pay for all hours they worked over 40 in a workweek. The second subgroup includes Plaintiff Ethel June Maranan and all other similarly situated leasing agents who

Plaintiffs allege were misclassified by Defendant as exempt employees under the FLSA and denied overtime compensation at a rate of one- and one-half times their regular rates of pay for hours they worked over 40 in a workweek." *Id.* at 1-2.

The Court has, following *Swales v. KLLM Transp. Servs., LLC*, 985 F.3d 430 (5th Cir. 2021), authorized preliminary discovery necessary to determine whether to certify a collective action and issue notice to potential plaintiffs, with a deadline of July 17, 2024 to complete pre-notice discovery and a briefing schedule for Plaintiffs' Motion for FLSA Certification and Notice that requires Plaintiffs to file their motion by September 6, 2024. *See* Dkt. No. 40 at 1-3.

A little over a month into this preliminary discovery period, Plaintiffs filed their Emergency Motion for Protective Order and Other Relief because, they allege, FirstKey "directly and illegally contacted and solicited Plaintiff Ethel June Maranan and members of the 'Regional Leasing Agent' putative class subgroup to sign an agreement purporting to waive their rights under the FLSA, settle any and all claims arising from this lawsuit, and prevent them from exercising their legal rights to participate in this FLSA action." Dkt. No. 41-1 at 1-2.

The parties have disagreed over the timing and sequence of certain events. But what matters for the Court's decision follows.

According to FirstKey, "[o]n April 23 and 24, 2024, FirstKey sent the proposed Voluntary Statements to 12 individuals who have served as Regional Leasing Agents ('RLAs') in the past three years," including three former employees, and, "[p]rior to

-3-

sending this document, Senior Director, Total Rewards Nellcine Ford met with available individuals currently employed by FirstKey who have served as RLAs in the past three years and have not joined the lawsuit." Dkt. No. 45 at 2 (cleaned up).

FirstKey explains that, although it "currently employs Maranan as an RLA, Ford did not meet with Maranan to discuss this issue, because she had joined this litigation and was represented by counsel." *Id.* FirstKey also explains that it "did not intend to send this document [(entitled a 'Voluntary Statement and Acknowledgement')] to any person who had joined or opted into this litigation." *Id.*

But "FirstKey mistakenly sent this document to Ethel Maranan (successfully delivered) and Nicole Torres (unsuccessfully delivered)." *Id.* at 2-3 (cleaned up).

FirstKey explains that its counsel learned of this when Plaintiffs' counsel "informed counsel for FirstKey on Wednesday, April 24, 2024, of the document sent to Maranan," although "[t]his email did not mention any document sent to Torres." *Id.* at 3 (cleaned up).

"Within one hour of that time, counsel for FirstKey informed counsel for Plaintiffs that Maranan should disregard the document." *Id.* (cleaned up). And, "[i]nstead, FirstKey's counsel provided Plaintiffs' counsel a letter for Maranan." *Id.* (cleaned up). That letter reads:

> Ethel J. Gumaru Maranan
> ***VIA EMAIL: EMaranan@firstkeyhomes.com***
>
> Re: Conversion of Regional Leasing Agents to Hourly Pay
>
> Dear E.J.:

-4-

> FirstKey has decided that, starting on April 28, 2024, it will begin paying all Regional Leasing Agents ("RLAs") on an hourly basis and will make them eligible for overtime. As a result, you will need to record all your hours worked in the UKG system starting April 28, 2024. Your hourly wage rate will be $25.0370 per hour without capped commissions, as will be described in an upcoming meeting.
>
> To ensure there is no question that RLAs were properly paid for all time worked, including any applicable minimum wage and overtime requirements, FirstKey has also decided to make an additional payment to RLAs assuming an overtime calculation was applied to work performed in the past three years. We have assumed that you worked an average of five overtime hours each week to assure you that you are being paid in full. Based on these calculations, FirstKey will provide you with a check via direct deposit in the amount of **$36,736.43** on April 26, 2024.
>
> If you ever think you have not been appropriately paid, you need to timely notify FirstKey of any potential errors so they can be investigated and, if appropriate, remedied.
>
> > Sincerely,
> > /s/Nellcine Ford
> > Nellcine Ford
> > Sr. Director, Total Rewards

Dkt. No. 50-1 at 23 of 46.

The Voluntary Statement and Acknowledgment that FirstKey sent to Maranan reads:

> VOLUNTARY STATEMENT AND ACKNOWLEDGMENT
> Ethel J. Gumaru Maranan states as follows:
>
>     1. I am over eighteen (18) years of age with personal knowledge of the matters in this Statement.
>     2. I am currently employed by FirstKey Homes, LLC.
>     3. I have worked as a Regional Leasing Agent from September 2022 to present (the "Period").
> I understand that FirstKey has decided that, starting on April 28, 2024, it will begin paying all Regional Leasing Agents ("RLAs") on an hourly

basis and will make them eligible for overtime. I understand that, as a result, I will need to record all hours I work in the UKG system starting April 28, 2024. I understand that my hourly wage rate will be $25.0370 per hour without capped commissions, as will be described in an upcoming meeting.

4. I understand that FirstKey wants to ensure there is no question that I have been paid for all work I have performed, including satisfying all minimum wage and overtime requirements, if applicable.

5. I agree with FirstKey's conclusion (based on my input) that, had I been classified as an hourly, overtime-eligible employee during the Period, I would be owed additional wages in an amount of not more than $36,736.43 ("Assumed Overtime Amount"). This assumes an average of five (5) overtime hours in every week of the Period, even in weeks in which I took vacation or other time off and did not work over 40 hours. I understand that FirstKey wants to ensure that it has more than compensated me for overtime, assuming the applicability of any overtime calculation.

6. I have communicated with FirstKey regarding the Assumed Overtime Amount. I have had sufficient time to review this calculation and request adjustments as necessary.

7. In reviewing the above calculation, I considered all relevant information and documentation. I know of nothing else that I could review that would change my calculation.

8. In accepting the payment of $36,736.43, I believe that I will have received all compensation that I am potentially owed, and FirstKey has satisfied all potential minimum wage and overtime requirements. There is no other time I can identify for which FirstKey owes me any pay. I understand that, if I ever think I have not been appropriately paid, I need to timely notify FirstKey of any potential errors so they can be investigated and, if appropriate, remedied.

9. I understand there is currently a case pending in the U.S. District Court for the Northern District of Texas, *Plunkett et al. v. FirstKey Homes, LLC*, Civil Action No. 3:23-CV-02684-L-BN, which involves, in part, allegations that Regional Leasing Agents such as myself were not properly paid. I have not joined or opted into that case, and I am not represented by legal counsel in that case. I understand that I have the right to consult with my own legal counsel before signing this statement and acknowledgement.

I affirm under the penalties for perjury that the foregoing is true and correct and that I am voluntarily, and without pressure or coercion, signing this statement and acknowledgement after I had enough time to review it.

Dated: _____            _____
                                Ethel J. Gumaru Maranan

Dkt. No. 50-1 at 2-3 of 46.

The Voluntary Statement and Acknowledgement was transmitted via DocuSign along with an attached FirstKey Homes Anti-Harassment Policy (with a signature block for the employee to "acknowledge receipt and understanding of this policy") and FirstKey Homes Non-Retaliation Policy (with a signature block for the employee to "acknowledge receipt and understanding of this policy") as well as an "Employee User Guide for Time Punches." Dkt. No. 50-1 at 4-17 of 46.

The Voluntary Statement and Acknowledgement sent to and executed by current FirstKey employees Ivanna Bertolani, Kendrea Richmond, Melody Look, and Zandile Fontenot contains the same language and attachments but different dates and time periods and dollar amounts. *See* Dkt. No. 50-1 at 30-41 of 46.

The same is true of the Voluntary Statement and Acknowledgement sent to and executed by former FirstKey employees Cynthia King and Catherine Capasso, except that their documents do not include the language affirming that "I understand that FirstKey has decided that, starting on April 28, 2024, it will begin paying all Regional Leasing Agents ('RLAs') on an hourly basis and will make them eligible for overtime. I understand that, as a result, I will need to record all hours I work in the UKG system starting April 28, 2024. I understand that my hourly wage rate will be $[X] per hour without capped commissions, as will be described in an upcoming meeting." Dkt. No. 50-1 at 42-46 of 46.

In response to Plaintiffs' Emergency Motion for Protective Order and Other Relief [Dkt. No. 41], FirstKey submitted an Affidavit of Nellcine Ford and a Supplemental Affidavit of Nellcine Ford, which attest:

> 1. I am Senior Director, Total Rewards for FirstKey Homes, LLC. I have held this position since July 2022.
> 2. On April 23 and 24, 2024, I sent proposed "Voluntary Statements and Acknowledgements" to nine current and three former employees who have served as FirstKey Regional Leasing Agents ("RLAs") in the past three years. This document informed current RLAs in this group that FirstKey was voluntarily converting them from exempt to non-exempt status, making them eligible for overtime moving forward, and that FirstKey was voluntarily paying them five hours of overtime per week for the past three years.
> 3. Before sending this document, I met with currently-employed individuals who have served as FirstKey RLAs (except for Ethel June (EJ) Maranan, who is a part of the lawsuit and is addressed below). For those still in an RLA role, I shared that effective April 28, 2024, FirstKey would begin paying RLAs on an hourly basis and would make them eligible for overtime. I advised them of changes that occur in relation to that change, including information regarding recording their time, reporting any time they think are not paid, and breaks. This is the same information that applies to all RLAs regardless of whether they participate in the above-captioned litigation.
> 4. I also orally shared with currently-employed individuals who have served as FirstKey RLAs (except for Ms. Maranan, who is addressed below) the company's decision to pay out assumed overtime, making payments to RLAs as if they had been classified as hourly over the past three years. I invited each RLA with whom I spoke to review the assumed 5-hour calculation and to request adjustments as necessary.
> 5. I state the following in relation to certain proposed Voluntary Statements and Acknowledgements that I sent:
>    a. Though the company wanted Ms. Maranan to have the same information about her employment that was given to other RLAs, there was no intention to communicate with her at all about the litigation or to receive or sign the Voluntary Statement and Acknowledgment. A different letter explained the administrative changes and requirements and assumed overtime to be paid to Ms. Maranan like the other RLAs. I should not have sent the Voluntary Statement and Acknowledgment to Ms. Maranan. I did not meet or otherwise communicate with Ms.

Maranan to discuss the company's decision or pending litigation, though of course she needed to be apprised in the normal course like other RLAs of the changes that would apply to her.

    b. In addition, I included Nicole Torres, a former employee who served as a FirstKey RLA for a short time, in the distribution of Voluntary Statements and Acknowledgements. I did not realize that she was an opt-in to the above-captioned lawsuit. I had no communication with Ms. Torres other than to send her the proposed Voluntary Statements and Acknowledgement via DocuSign. My DocuSign link to Ms. Torres did not show that she received or viewed the proposed Voluntary Statement and Acknowledgement sent to her. I caused the link to be voided. My understanding is that Ms. Torres has not seen the Voluntary Statement and Acknowledgment sent to her.

    6. The information that was included in my letter to Ms. Maranan that was forwarded to her counsel on April 24, 2024, was information that she needed to understand in relation to changes taking effect on April 28, 2024. These changes will be further discussed with all RLAs, including Maranan, but we did not want it to appear that the company was treating Maranan differently than other RLAs because she joined this lawsuit.

    ….

    2. Effective April 28, 2024, FirstKey began paying Regional Leasing Agents ("RLAs") on an hourly basis and made them eligible for overtime.

    3. As part of shift to paying RLAs hourly, the nine current and three former RLAs, including Ethel June Maranan and Nicole Torres, received a payment for an assumed five hours of overtime per week they worked as an RLA during the past three years. These payments were distributed on April 26, 2024.

    4. RLAs were not required to sign anything in exchange for this payment.

    5. I prepared a letter to Ms. Maranan to advise her of the changes that would occur in relation to her change to hourly. The last line of the letter told Ms. Maranan that if she ever thinks she has not been appropriately paid, she needs to timely notify FirstKey of any potential errors so they can be investigated, and, if appropriate, remedied. This statement reiterated FirstKey's handbook provision which instructs team members to promptly bring discrepancies in pay to the attention of their supervisors so corrections can be made.

    6. The Voluntary Statements and Acknowledgements I sent to the 12 current and former RLAs also contained a statement reiterating this handbook provision.

> 7. The letter to Ms. Maranan was forwarded to her counsel on April 24, 2024. FirstKey has had no further communications with Ms. Maranan regarding the substance of this case.

Dkt. No. 42-1 at 27-29 of 29; Dkt. No. 45-1 at 1-2.

## Legal Standards and Analysis

Plaintiffs' Emergency Motion for Protective Order and Other Relief raises two related but distinct issues:

- First, what, if anything, should be done about FirstKey's contact or attempted contact directly with represented parties (Plaintiff Ethel June Maranan and opt-in plaintiff Nicole Torres), and
- Second, whether communications and payments to other individuals currently or formerly working for FirstKey were improper in light of this FLSA action where these individuals have not joined this case or another FLSA collective action.

The Court will take up the second issue first.

### I. FirstKey's actions as to potential opt-in plaintiffs warrant a protective order and other sanctions and remedies.

As another judge in this district has summarized, "[c]ourts have broad authority to govern the conduct of counsel and parties in FLSA collective actions …. because FLSA cases present significant opportunities for abuse, most often in the form of improper communications that undermine the collective action process." *Williams v. Sake Hibachi Sushi & Bar, Inc.*, No. 3:18-cv-517-D, 2018 WL 4539114, at *2 (N.D. Tex. Sept. 21, 2018) (cleaned up).

"The court, for example, has the power to regulate communications between a party and absent class members that are 'misleading, coercive, or an attempt to undermine the collective action,' although the court's discretion in this respect is not

-10-

unlimited." *Id.* (cleaned up) "In fact, communications that are litigation-neutral need not be restricted, and no communications restrictions should be made without a specific record showing by the moving party of the particular abuses by which it is threatened." *Id.* (cleaned up).

And, so, "[i]n the Fifth Circuit, district courts have applied a two-part test for determining whether to issue an order impacting a party's speech with absent class members":

- "First, the court determines whether there is a need for a restriction on speech by evaluating whether the party's speech is 'misleading, coercive, or an attempt to undermine the collective action."
- "Second, if such a need exists, the court then tailor[s] appropriate injunctions and sanctions in light of First Amendment concerns."

*Id.* (cleaned up).

At oral argument, counsel agreed that – at least when leaving out assigned represented plaintiffs Ethel June Maranan and Nicole Torres – FirstKey's paying its former or current employees for past work was not, by itself, the issue here. Plaintiffs' concerns stem from FirstKey's sending the payment, by direct deposit, along with the Voluntary Statement and Acknowledgement to these 12 current or former employees who have not opted into this case, after Nellcine Ford met with the current employees.

The parties disagree as to whether each Voluntary Statement and Acknowledgement is an attempt at executing a settlement agreement or waiver or release of FLSA claims. And the Voluntary Statement and Acknowledgement does not use any words or phrases like "settle," "waive," "release," or "agree not to bring."

But the Court determines that, in substance, the Voluntary Statement and Acknowledgement is likely to mislead an employee into believing that, in exchange for a payment, they have agreed not to join this FLSA case and have agreed not to seek (or agreed that they cannot seek) any additional unpaid wages or remedies. That is because the documents all state:

- "I understand that FirstKey wants to ensure there is no question that I have been paid for all work I have performed, including satisfying all minimum wage and overtime requirements, if applicable."
- "I agree with FirstKey's conclusion (based on my input) that, had I been classified as an hourly, overtime-eligible employee during the Period, I would be owed additional wages in an amount of not more than $[X] ("Assumed Overtime Amount"). This assumes an average of five (5) overtime hours in every week of the Period, even in weeks in which I took vacation or other time off and did not work over 40 hours. I understand that FirstKey wants to ensure that it has more than compensated me for overtime, assuming the applicability of any overtime calculation."
- "In accepting the payment of $[X], I believe that I will have received all compensation that I am potentially owed, and FirstKey has satisfied all potential minimum wage and overtime requirements. There is no other time I can identify for which FirstKey owes me any pay."

Under these circumstances, the Court sees no reason to distinguish the issues and remedies sought here from those in cases that involved the defendant getting the possible opt-in plaintiffs to sign a release or waiver of FLSA claims or a promise not to bring a FLSA claim.

And the Court finds that FirstKey's communications with these 12 current or former employees, including through the Voluntary Statement and Acknowledgement sent for their signatures and execution via DocuSign, have been misleading and coercive and reflect an apparent attempt to undermine this collective action. That is so for several reasons.

The Court finds that it was misleading and coercive for FirstKey's Voluntary Statement and Acknowledgement to identify this case (*Plunkett*) and, in conjunction with statements in paragraph 8 that, "[i]n accepting the payment of $[X], I believe that I will have received all compensation that I am potentially owed, and FirstKey has satisfied all potential minimum wage and overtime requirements," ask the employees to state that "I have not joined or opted into that [*Plunkett*] case." That gives rise to the realistic possibility that a current or former employee, presented with and signing off on this, would believe that they should not and will not join the *Plunkett* case – all while FirstKey's Voluntary Statement and Acknowledgement identifies nothing about the claims in this case or the possibility that the individual could join the case as a plaintiff or the potential remedies beyond an underpayment that are available, including liquidated damages and attorneys' fees. *Compare Williams*, 2018 WL 4539114, at *3.

And the Court finds that it was misleading and coercive for FirstKey's Voluntary Statement and Acknowledgement to include the statement that "I understand that, if I ever think I have not been appropriately paid, I need to timely notify FirstKey of any potential errors so they can be investigated and, if appropriate, remedied." Based on what does accompany it (the statements immediately before it) and does not accompany it (any explanation of an employee's rights and options under the FLSA), that statement – even if based on FirstKey's employee handbook's provision that may be designed to encourage employees to speak up about pay

discrepancies or mistakes – suggests that someone working for FirstKey cannot first consult their own attorney or even bring a FLSA claim if they have evidence that they have been underpaid. And it suggests instead that they must first comply with some kind of employer-level exhaustion or notice presentment prerequisite to bring a FLSA claim. But that is not the law. *See generally Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981) ("No exhaustion requirement or other procedural barriers are set up, and no other forum for enforcement of statutory rights is referred to or created by the statute. This Court's decisions interpreting the FLSA have frequently emphasized the nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act. Thus, we have held that FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate." (cleaned up)).

The Court finds that, despite its supposed voluntary nature, FirstKey's Voluntary Statement and Acknowledgement is made more misleading (as to whether signing was voluntary or optional) and more coercive because it was transmitted via DocuSign along with two additional and unrelated human resources policies that also called for the recipient's signature. And, "[d]ue to the nature of FLSA actions (providing employees recourse against employers), the threat of coercion is often high, and that threat is a common justification for communication restrictions between the putative class and defendant employers." *Williams*, 2018 WL 4539114, at *3.

And, in the face of these concerns, FirstKey has offered no persuasive reason

-14-

for why it would send this Voluntary Statement and Acknowledgement when unilaterally deciding to reclassify the RLAs and making these payments (1) that FirstKey tells the Court – but did not tell the employees in the transmitted Voluntary Statement and Acknowledgement – that it would make with or without a signed Voluntary Statement and Acknowledgement and (2) for which FirstKey provided no breakdown or methodology for the calculation of the payment amount for each individual.

All of these considerations lead the Court to determine that FirstKey's Voluntary Statement and Acknowledgement is, on its face and in context, coercive and misleading and that the only plausible explanation, on this record, for soliciting signatures on these documents is that FirstKey was attempting to undermine the collective action in this case. And, so, FirstKey's communications here "are the type of communication that the court has the authority and duty to restrict." *Williams*, 2018 WL 4539114, at *4.

Turning to appropriate remedies, "[c]ourts have ordered a variety of remedial measures for misleading and improper communications, including prohibiting further ex parte communications, issuing corrective notices, extending the opt-in period, and awarding attorney's fees and costs." *Id.* at *5.

The Court imposes what it determines to be the appropriate remedies here by:

- entering a protective order mandating that FirstKey cannot have direct contact with potential opt-in plaintiffs regarding the substance of this case or prior payments (or nonpayment) of overtime or send any settlement agreements or releases or waivers of FLSA claims or any communications

   like the Voluntary Statement and Acknowledgement at issue here;
- ordering that FirstKey must, by **Monday, June 3, 2024**, turn over to Plaintiffs' counsel copies of the attachments to any signed Voluntary Statement and Acknowledgement that is sent to its current or former leasing agents as well as copies of any unsigned Voluntary Statement and Acknowledgement that FirstKey sent out to its current or former leasing agents; and
- ordering under Federal Rule of Civil Procedure 26(c)(3) that FirstKey and its counsel of record in this case (or their law firm) are required to pay, jointly and severally, the reasonable attorneys' fees and costs incurred for Plaintiffs' counsel to draft and file their Emergency Motion for Protective Order and Other Relief [Dkt. No. 41] and accompanying joint report [Dkt. No. 41-1] and reply and appendices [Dkt. No. 42 & 49 & 50] in support.

Plaintiffs urge the Court to void any signed Voluntary Statement and Acknowledgement that any former or current employee signed. But no current plaintiff did so, and the Court has no evidence before it that any other current or former employees want to have their own signed Voluntary Statement and Acknowledgement voided. *Accord Williams*, 2018 WL 4539114, at *5.

Plaintiffs also urge the Court to authorize issuance of a corrective notice. But whether this case can proceed as a collective action under Section 216(b) and, if so, what the class or classes of similarly situated members would be is not yet resolved. The Court will instead consider the appropriateness of a curative notice if and when the Court determines that, consistent with *Swales*, notice to potential opt-in plaintiffs should issue. *Cf. Ross v. Wolf Fire Prot., Inc.*, 799 F. Supp. 2d 518, 527 (D. Md. 2011).

## II.   FirstKey cannot have direct contact with represented plaintiffs about the substance of this case.

The first issue that Plaintiffs' motion present is serious but can be succinctly addressed.

As FirstKey's counsel have repeatedly now acknowledged, FirstKey cannot have direct contact with represented parties about the substance of this case or prior payments (or nonpayment) of overtime, including by sending any settlement agreements or releases or waivers of FLSA claims or any communications like the Voluntary Statement and Acknowledgement at issue here. *See generally Orchestrate HR, Inc. v. Trombetta*, 178 F. Supp. 3d 476, 485 (N.D. Tex. 2016), *objections overruled*, 2016 WL 5942223 (N.D. Tex. Oct. 13, 2016).

FirstKey should not have done so with represented plaintiffs Ethel June Maranan and Nicole Torres. And it cannot do so again.

## Conclusion

For the reasons and to the extent explained above, the Court grants in part and denies in part Plaintiffs' Emergency Motion for Protective Order and Other Relief [Dkt. No. 41].

The Court directs Plaintiffs' counsel and FirstKey's counsel to confer by telephone or videoconference or in person about the reasonable amount of the attorneys' fees and costs to be awarded, as specified above.

By no later than **Wednesday, June 12, 2024**, the parties must file a joint report notifying the Court of the results of the conference. If all disputed issues as to the amount of attorneys' fees and costs to be awarded to Plaintiffs have been resolved, Plaintiffs' counsel must also send an agreed proposed order to the Court at Horan_Orders@txnd.uscourts.gov by **Wednesday, June 12, 2024**.

If the parties do not reach an agreement as to the amount of attorneys' fees and costs to be awarded, Plaintiffs' counsel must, by no later than **Wednesday, June 19, 2024**, file an application for attorneys' fees and costs that is accompanied by supporting evidence establishing the amount of the reasonable attorneys' fees (as described above) to be awarded. The fee application must be supported by documentation evidencing the "lodestar" calculation, including affidavits and detailed billing records, and citations to relevant authorities and must set forth the itemized number of hours expended in connection with the recoverable attorneys' fees described above as well as the reasonable rate(s) requested. *See Tollett v. City of Kemah*, 285 F.3d 357, 367 (5th Cir. 2002).

If Plaintiffs files an application, FirstKey must file a response by **Wednesday, July 10, 2024**, and Plaintiffs must file any reply by **Wednesday, July 24, 2024**.

SO ORDERED.

DATED: May 22, 2024

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE